## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| ASCION, LLC, D/B/A REVERIE, | |
| Plaintiff, | |
| v. | Civil No. 2:15-cv-12067-DPH-EAS |
| TEMPUR SEALY INTERNATIONAL, INC. (F/K/A TEMPUR-PEDIC INTERNATIONAL INC.) AND TEMPUR-PEDIC MANAGEMENT, LLC, | Chief District Judge Denise Page Hood Magistrate Judge Elizabeth A. Stafford |
| Defendants. | JURY TRIAL DEMANDED |

## DEFENDANTS TEMPUR SEALY INTERNATIONAL, INC. AND TEMPUR-PEDIC MANAGEMENT, LLC'S
## OPENING CLAIM CONSTRICTION BRIEF[1]

---

[1] Tempur reserves the right to refile this brief dependent upon the Court's resolution of Reverie's Motion to Limit Claim Terms for Construction (Dkt. 47).

## TABLE OF CONTENTS

I.   OVERVIEW OF THE ASSERTED PATENTS. ..................................................1

II.  LEGAL STANDARD. ...................................................................................2

III. PROPOSED CONSTRUCTIONS....................................................................3

   A.  "Increment Value." ...................................................................................3

   B.  "Two-Way Wireless Communication." .....................................................6

   C.  "Initiate a Communication from the Adjustable Bed Controller to the
       Handheld Remote Control." ......................................................................9

   D.  "Providing Feedback to a User." .............................................................11

   E.  "Code Key."..............................................................................................12

   F.  "Second System." ....................................................................................14

   G.  "The Row Representing."........................................................................16

   H.  "Wood." ...................................................................................................18

   I.   Claimed Design of the D553 Patent. .......................................................19

IV. INDEFINITENESS. .....................................................................................21

   A.  "A Controller of the Component" and "The Controller." .......................21

   B.  "Control Command."...............................................................................22

   C.  "Mechanically Controlled."....................................................................23

   D.  "The Position Recall Command." ...........................................................23

   E.  "Optionally One or More."......................................................................23

   F.  "Substantially Flat" and "Substantially Raised." ...................................24

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Boston Scientific Corp. v. Cordis Corp.*,
   2006 WL 3782840 (N.D. Cal. Dec. 20, 2006)......................................................11

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories*,
   No. 3:15-CV-64, 2016 WL 4238640 (D. Or. Aug. 10, 2016)..............................11

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006) ...........................................................................23

*Elmer v. ICC Fabricating, Inc.*,
   67 F.3d 1571 (Fed. Cir. 1995) .............................................................................19

*Ex Parte Lazzara*,
   Appeal No. 2007-0192, 2007 WL 5963473 (BPAI Nov. 13, 2007) ...................25

*Golden Hour Data Sys., Inc. v. Health Servs. Integration, Inc.*,
   No. C 06-7477, 2008 WL 2891059 (N.D. Cal. July 22, 2008) ..............................8

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ...........................................................................22

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) ...........................................................................25

*Hockeyline, Inc. v. Stats, LLC*,
   No. 1:13-cv-1446, 2013 WL 11091886 (S.D.N.Y. Dec. 16, 2013) ....................24

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) .............................................................................2

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) ...........................................................................24

*Invitrogen Corp. v. Clontech Labs.*,
   No. 8:96-cv-4080, Slip Op. Dkt. No. 334 (D. Md. May 4, 2001) .......................25

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) .................................................................................2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S.Ct. 2120 (2014).........................................................................................21

*Omega Eng'g, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) .............................................................................4

*Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*,
  731 F.2d 818 (Fed. Cir. 1984) ................................................................24
S*port Dimension, Inc. v. Coleman Co.*,
  820 F.3d 1316 (Fed. Cir. 2016) ...........................................................19
*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) .............................................................2
*Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) ............................................................2
*Unique Concepts, Inc. v. Brown*,
  939 F.2d 1558 (Fed. Cir. 1991) ..........................................................10
*Young v. Lumenis, Inc.*,
  492 F.3d 1336 (Fed. Cir. 2007) ..........................................................21

## Statutes

35 U.S.C. § 112(b) ..................................................................................21
35 U.S.C. § 112(d) ..................................................................................23

Tempur submits its Opening Claim Construction Brief addressing certain terms from the Reverie's 31 asserted claims:

| No. | Asserted Patents | Asserted Claims |
|-----|------------------|-----------------|
| 1 | U.S. Patent No. 8,682,457 ("the '457 Patent") | 20, 21, 23, 24, 25 |
| 2 | U.S. Patent No. 8,909,357 ("the '357 Patent") | 1, 11, 14, 17, 18 |
| 3 | U.S. Patent No. 8,046,116 ("the '116 Patent") | 1, 21, 33, 40, 41 |
| 4 | U.S. Patent No. 8,565,934 ("the '934 Patent") | 1, 2, 4, 6, 7 |
| 5 | U.S. Patent No. 9,044,366 ("the '366 Patent") | 1, 10, 13, 14, 25 |
| 6 | U.S. Patent No. 8,869,328 ("the '328 Patent") | 1, 11, 12, 13, 18 |
| 7 | U.S. Design Patent No. D720,553 ("the D553 Patent") | 1 |

Because Reverie cannot prove infringement of the asserted claims as written, Reverie attempts to impermissibly broaden the scope of its claims through claim construction. Claims do not exist in a vacuum, however, and courts are directed to consider claims in the context of a patent's written description and prosecution history. Here, the intrinsic records of the asserted patents provide objective boundaries on the asserted claims' scope. Otherwise, as Reverie now attempts to do, the claims could be applied well beyond their original scope to capture technology not disclosed or claimed by the patentee.

## I.     OVERVIEW OF THE ASSERTED PATENTS.

As explained in Tempur's Technology Tutorial, the '457, '328, '116, and '934 Patents (collectively, "Family Patents") are all from the same patent family. These patents all share an identical specification and all claim priority to the same provisional application. The later patents in the family are continuations from earlier applications. Because these patents share identical specifications and

history, claim terms or concepts overlapping between those patents should be construed consistently. *See Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016).

Reverie additionally asserts three other patents. The '357 Patent covers using a remote control to synchronously adjust side-by-side bed foundations. The '366 Patent covers a specific orientation for the metal support structure of an adjustable bed foundation. Finally, the D553 Patent covers a specific ornamental bed design.

## II.    LEGAL STANDARD.

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Claim construction's purpose is to resolve the meanings and technical scope of claim terms. When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). The claims of a patent define the scope and "metes and bounds" of the patentee's invention. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Accordingly, claim construction begins with and "remain[s] centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

The best guide for defining a disputed term is a patent's intrinsic evidence. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002).

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**                    2

Intrinsic evidence includes the patent's claims, specification, and prosecution history.  *Id.*  In contrast, extrinsic evidence includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Markman*, 52 F.3d at 980.  Extrinsic evidence is generally less useful or reliable and it should not be relied on when it contradicts the intrinsic evidence. *Id*. at 981.

## III.   PROPOSED CONSTRUCTIONS.

The parties have reached one agreement: claim 21's preamble of the '116 Patent is limiting on that claim. The parties have reached no other agreements.

### A.   "Increment Value."

| Claim Term | Tempur's Proposed Construction |
| --- | --- |
| "increment value"<br>(Claims 1, 21, 33, 40 of the '116 Patent) | "increment angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator" |
| "increment value"<br>(Claim 1 of the '934 Patent) | "increment angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator" |
| "value representative of an acceptable value"<br>(Claim 23 of the '457 Patent) | "value representative of an acceptable angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator" |
| "an actuator position"<br> (Claims 1, 13 of the '328 Patent) | "an angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator" |

Tempur contends these overlapping terms and constructions for the Family Patents are dispositive. These terms are used in the same manner and context across the Family Patents' claims; thus, their construction should also be uniform.

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**                                    3

These terms relate to how the alleged invention stores bed position information.  As background, the Family Patents' specification outlines the types of information that can be stored in bed position data tables:

> [T]he available positions 212 may be a set of increments of section positions that may include a set of actuator 104 positions, a set of actuator 104 activation times, ***bed section rotation angles***, or the like … For example, the user may be able to select the type of graduations by selecting from a set of possible graduation methods such as distance, ***angle of rotation***, actuation time, or the like.

Ex. 1 at 22:56-67 ('116 Patent) (emphasis added), 23:31-34, 25:59-60.  During prosecution, however, the patentee expressly disclaimed any measurement by clock or counter. The only remaining disclosed option is angle of rotation.

During prosecution, the patentee unequivocally disclaimed claim scope to avoid invalidating prior art. "The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).

During prosecution of the '934 Patent, the patentee relinquished claim scope to avoid the prior art reference *Leventhal.*[2] Specifically, in response to an Office

---

[2] The Federal Circuit has held that "[w]hen the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."  *Ormco Corp.*, 498 F.3d at 1314.  Since the disclaimer in the '934 and '328

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** 4

Action rejecting the claims, the patentee argued:

> *Leventhal* suggests storing a 'time duration associated with [a] selected position.' However, this approach to bed control requires substantial overhead. As [*sic*] a minimum, a processor must independently operate '***an internal or external clock or counter***.' ***By contrast, the claimed invention stores actuator values directly so that a control signal can be issued directly to the corresponding hardware***.

Ex. 2 at 8-9 (April 30, 2012 '934 Patent Office Action Response) (emphasis added); Ex. 3 at 5-6 (March 18, 2013 '328 Patent Office Action Response) (same).

The patentee unambiguously disclaimed the "internal or external clock or counter" in *Leventhal*, and states "[b]y contrast," the alleged invention "stores actuator values directly" so they can be acted upon directly. *See* Ex. 2 at 8 (patentee representing that the alleged invention as a whole is meant to reduce the required processing power and memory footprint for recalling a bed position "by storing in that location an increment value that is directly realizable by an actuator"). Therefore, the actuator must be able to act upon the stored value without further analysis or calculation. Any value stored as actuator operation time or actuator extension distance would (1) require measurement by clock or counter and (2) result in a value not directly realizable by the actuator because a calculation by the processor in the control box would be necessary to determine how much actuator extension time or distance is required to move a bed segment from its

---

Patents relates to the invention as a whole, they are relevant to the overlapping claim terms across the Family Patents.

current position to the user's desired recall position. Therefore, the patentee's disclaimer excludes values measured by actuator operation time or actuator extension distance from the claimed scope of the alleged invention because neither is directly realizable by an actuator and both are measured by either clock or counter. Accordingly, the patentee's disclaimer limits the alleged invention to actual angles of rotation, as this is the only non-disclaimed value disclosed in the specification that can be directly realizable by an actuator.

**B.    "Two-Way Wireless Communication."**

| Claim Term | Tempur's Proposed Construction |
|---|---|
| "capable of two-way wireless communication with" (Claim 20 of the '457 Patent) | "wirelessly communicating back and forth with" |
| "two-way wireless communication system" (Claim 20 of the '457 Patent) | "system for wirelessly communicating back and forth between the controller and the handheld remote control" |
| "two-way wireless communication system adapted to communicate" (Claims 1, 13 of the '328 Patent) | "system for wirelessly communicating back and forth" |

Tempur's construction clarifies for the jury that "two-way wireless communication" means wireless communication back and forth. The parties do not dispute that the patent teaches bidirectional communication between a remote control and controller. *See* Ex. 4 at 17:36-39, 20:60-21:7, 22:11-23, 22:24-27, 39:54-40:2 ('457 Patent). But the parties dispute whether that feature is a required claim limitation. Tempur contends its construction provides the jury necessary clarity as to the claims' scope and requirement for bidirectional communication.

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF                6**

Reverie's construction improperly seeks to make two-way communication merely optional. For example, claim 20 of the '457 Patent requires "the controller capable of two-way wireless communication with a handheld remote." Reverie contends that "capable" means "able to, but need not." However, "capable" as used in this claim means that the system performs the two-way communication.

The Court need not stray from the remainder of the claim to reject Reverie's position. Claim 20's second limitation requires that "commands can be received and executed *therebetween*" with regards to the remote control and controller. The word "therebetween" explicitly requires bidirectional communication.

Moreover, the last three limitations of claim 20 provide: "the handheld remote control *capable of*: transmitting a control signal to the adjustable bed controller using the two-way wireless communication system; and providing feedback to a user on the handheld remote control to indicate the success of the command." The term "capable of" is used in the third to last limitation, and qualifies the last two limitations of the claim. If "capable of" means "able to, but need not," then the last two limitations of the claim would be entirely optional since they are modified by "capable of." This was not the patentee's intent. As the claim shows, "capable of" is analogous to "made to." Given how the patentee used the term in the claim, Reverie's position must be rejected.

Furthermore, claim 20's last two limitations alone mandate rejecting

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** 7

Reverie's position. As quoted above, in response to the control signal, the bed controller sends the remote control a confirmation of the success of the command, such that the remote control can indicate the success of the command to the user. It is impossible to provide the user an indication of command success without communication back from the bed controller to the remote control. Importantly, indicating the "success of a command" is not the same as indicating a command was sent from the remote control to the bed controller.  Indicating the success of the command requires feedback from the bed controller to the remote control.

Other courts have similarly construed "capable" as requiring the function, as opposed to optionally requiring the function. *See Golden Hour Data Sys., Inc. v. Health Servs. Integration, Inc.*, No. C 06-7477, 2008 WL 2891059, at *4 (N.D. Cal. July 22, 2008) (rejecting optionality in the claim because "[i]n the contexts in which 'capable of' is used in the '073 patent, one skilled in the art would readily ascertain its meaning as 'able to.'").

In contrast, claims 1 and 13 of the '328 Patent ***completely*** lack the term "capable" found in claim 20 of the '457 Patent. Claims 1 and 13 require "a two-way wireless communication system ***adapted to*** communicate between a handheld remote control and an adjustable bed controller." Reverie's uniform proposed construction—"able to, but need not"—ignores the difference in claim language which unequivocally requires ***actual*** two-way communication.

C.   **"Initiate a Communication from the Adjustable Bed Controller to the Handheld Remote Control."**

| Claim Term | Tempur's Proposed Construction |
|---|---|
| "the adjustable bed controller further adapted to initiate a communication from the adjustable bed controller to the handheld remote control to indicate that the adjustable bed controller has responded to the position recall command" (Claims 1, 13 of the '328 Patent) | "the adjustable bed controller further adapted to initiate a communication from the adjustable bed controller to the handheld remote control to indicate that the adjustable bed controller has successfully completed the position recall command." |

The parties' dispute regarding this term is analogous to the prior terms' dispute regarding "capable of." Here, the dispute centers on "adapted to." Reverie rewrites the claims to make the two-way wireless communication optional, even though the claims expressly require two-way communication and feedback from the bed controller to the remote control.

Tempur's proposal clarifies for the jury that the communication from the bed controller to the remote is an indication that the controller successfully completed the command. The claims require a communication acknowledging that the bed controller has successfully responded to the remote command. Both claims require:

> [T]he adjustable bed ***controller adapted to provide the control signal to the actuator to adjust***, following receipt of the position recall command, ***the actuator position to a preset actuator position*** within a predetermined range of acceptable actuator positions stored in memory ***to place the bed segment in a position corresponding to the preset recall position***.

Both claims further require "an actuator coupled to the adjustable bed controller, adapted to move to an actuator position upon receiving a control signal from the

adjustable bed controller thereby adjusting a position of a bed segment, and adapted to provide its actuator position." Thus, the bed controller provides the control signal to the actuator to adjust, the actuator adjusts in response, and then the actuator provides its actuator position to the controller so that feedback can be sent to the remote control indicating success of the position recall command.

In contrast, Reverie's construction attempts to rewrite "adapted to" to mean "able to, but need not." The claim language itself rejects Reverie's construction: "the adjustable bed controller further **adapted to** initiate a communication **from** the adjustable bed controller **to** the handheld remote control." The use of "adapted to" is used to disclose the bed controller's communication requirements. There is no optionality in the claim language.

Moreover, Reverie's position leads to an illogical result when considered in the context of the entire claim.  In claim 1, "adapted to" is used a total of six times, including at the beginning of each limitation. For example, the second limitation states "the handheld remote control having a user interface **adapted to**." This pattern continues for **every single limitation** of claim 1.  This is also true for claim 13, where "adapted to" is used seven times. Construing "adapted to" as "able to, but need not" would therefore **render every single limitation as optional**. Accordingly, Reverie's construction violates black letter patent law. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1563 (Fed. Cir. 1991) ("When the

language of a claim is clear, as here, and a different interpretation would render meaningless express claim limitations, we do not resort to speculative interpretation based on claims not granted.").

Even more detrimental to Reverie's position is that numerous courts have construed "adapted to" in a manner contradictory to Reverie's proposal. *Boston Scientific Corp. v. Cordis Corp.*, 2006 WL 3782840, at *3 (N.D. Cal. Dec. 20, 2006) (construing "adapted to," in light of patent as a whole, to mean "configured to," not "capable of," and that "'configured to' embraces the concept of a device intentionally and specifically made to act in a certain way"); *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories*, No. 3:15-CV-64, 2016 WL 4238640, at *6 (D. Or. Aug. 10, 2016) (finding "'adapted to' or 'adapted for' means 'suited by design to' or 'suited by design for'")). In the context of the Family Patents, "adapted to" does not confer an optional feature as Reverie suggests.

### D.   "Providing Feedback to a User."

| Claim Term | Tempur's Proposed Construction |
|---|---|
| "providing feedback to a user on the handheld remote control to indicate the success of the command" (Claim 20 of the '457 Patent) | "providing feedback from the controller to the receiver to the user on a handheld remote control to confirm the success of the control signal" |

Tempur's construction for this term incorporates two concepts. First, the feedback communication goes from a bed controller, to a receiver, then to a remote control. Second, the feedback signal confirms the success of the control signal.

First, in order to "indicate the success of the command," as the claim requires, the feedback must originate from the bed controller, as that is the component that controls the actuators. *See* Ex. 4 at 37:46-49. In the claim, the controller includes "a wireless interface" which permits the "two-way wireless communication with a handheld remote control." In the specification, the "wireless interface" is disclosed as the receiver, the interface between the remote control and the controller. *Id*. at 17:22-24 ("[T]he remote may communicate to the receiver 130 and the receiver may transmit the received user command request to the control box 134."). Thus, the feedback is provided from the controller, through the receiver, and to the remote control.

Second, that feedback signal is a confirmation of the success of the control signal sent from the remote control to the bed controller.  The claim language states that the feedback "indicate[s] the success of the command."  Therefore, the indication of success must be a confirmation.  Additionally, confirmation of the success of "the command" in the last limitation of the claim must relate to the "control signal" in the second to last limitation because that signal was originally provided from the remote control to the controller, and thus the feedback must be confirming the success of that signal.

E.    "Code Key."

| Claim Term | Tempur's Proposed Construction |
|---|---|
| "code key indicating that | "unique identifier included at the beginning of, |

| commands can be received and executed therebetween" (Claim 20 of the '457 Patent) | the end of, or as part of the transmission of a control command" |
|---|---|
| "unique communication link" (Claim 1 of the '934 Patent) | "unique identifier included at the beginning of, the end of, or as part of the transmission of a control command" |

Tempur first addresses the construction of the '457 Patent. Tempur's construction is true to the surrounding claim language and specification. Claim 20 of the '457 Patent requires "wherein the handheld remote control is communication matched to the adjustable bed controller with a code key indicating that commands can be received and executed therebetween." Accordingly, the code key must be a unique identifier, or communication matched, such that the controller only receives signals from a specific remote control.

The Family Patents' specification confirms Tempur's proposed construction:

> [T]he receiver 130 may receive the user commands from the remote 130 and transmit the same command to the control box 134; ... the remote 148 and receiver 130 may be *communication matched by the use of a code key*. The *code key may be any indicator that may be interpreted by the remote 148 and receiver 130 that commands may be received and executed between the remote 148 and receiver 130* ... *The code key may be transmitted as the beginning of the communication, the end of the communication, as part of the communication or the like*.

Ex. 4 at 17:30-46 (emphasis added). This echoes claim 20 and explains that the code key is transmitted at the beginning of, the end of, or as part of the communication. The specification provides no other disclosure for transmitting the code key, and thus, the terms must be defined consistent with this disclosure.

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**                    13

The Family Patents' specification also states that:

> [T]he remote 148 may communicate with the receiver 130 using a connection key. The connection key may be a code that indicates that a certain remote is associated with a certain adjustable bed facility 102. When the remote 148 transmits information to the receiver, the remote may first send a key code to indicate that the remote 148 is associated with the adjustable bed facility 102. If the key code matches the key that the receiver 130 is *listening for*, the receiver 130 may receive the command from the remote.

Ex. 4 at 22:27-35 (emphasis added). As the above illustrates, the bed is always listening for a communication with the correct code key. The bed will then only respond if it receives a communication with the correct code key. Therefore, as Tempur's construction provides, the code key must be at the beginning of, end of, or part of the communication sent from the remote control to the bed.

The '934 Patent's "unique communication link" must receive a similar construction. The unique communication link is the same as a code key. This link allows the remote to uniquely communicate with the bed. There is no other disclosure in the specification for communication matching a remote and bed.

**F.      "Second System."**

Tempur contends "second system" in claims 1, 21, 33, and 40 of the '116 Patent should be construed as "system peripheral to the adjustable bed." All of these claims specifically identify a modular controller as a required limitation. Figure 1 and the specification of the Family Patents shows the modular controller is a component separate from the receiver or control box, and is responsible for the

control of devices peripheral to the adjustable bed. The specification states with regards to the modular controls and "second system" that:

> Another aspect of this invention may be to provide the ability to provide ***additional functionality to the adjustable bed by using modular controls*** that may be able to communicate with the user's interface control. The ***modular controls may be designed to control a number of additional devices and facilities that may include audio devices, video devices, lamps, air purification facilities, power outlets, and the like***.

Ex. 1 at 9:53-59 (emphasis added). The modular controller controls peripheral devices, or second systems, that are in addition to the adjustable bed. The specification's treatment of modular controller and second systems is consistent throughout, and does not provide any other alternative description:

> In an embodiment, the ***modular controls 132 may provide additional functionality to the adjustable bed facility 102 that may include a stereo, a CD player, an MP3 player, a DVD player, a lamp, power outlets 138, an air purification facility 144, or the like***. ***The additional functionality that the modular controls 132 provide may be considered optional equipment that may be offered with the adjustable bed facility 102***. For example, a user may be able to purchase an adjustable bed facility 102 ***without any*** modular controls 132 and ***may add*** modular controls as he or she desires.

Ex. 1 at 36:32-41 (emphasis added), 21:25-32 ("the modular controls 132 to provide the user with control over other devices that may be connected to the adjustable bed facility 102."), 36:46-66 (same). The modular controls operate optional additional equipment (or second systems) that is separate from the adjustable bed.  In fact, the claims themselves adopt this same distinction. *See* '116

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**                    15

Patent's claim 1 ("[P]roviding a modular controller for controlling an adjustable bed and at least one second system associated with the adjustable bed.")

Consistent with the specification, the other unasserted claims reflect that the second system is peripheral to the adjustable bed. For example, dependent claims 2 through 7 cover specific embodiments of the "second system," including "lighting system," "air purification system," "alarm clock," "music player," "telephone," and "video system." Other dependent claims in the '116 Patent provide analogous disclosures. *See* claims 9-11, 17-20, 22-27, 29-32, 34-39, 42-45. Thus, every disclosure of "second system" in Family Patents is consistent with the disclosure that a second system is peripheral to the bed.

Unsurprisingly, the specification's description of a modular controller and "second system" is consistent with the problem allegedly solved by the invention:

> As users spend more and more time in adjustable beds they may desire to have a level of independence by ***controlling devices that may be in the room from the adjustable bed***. The devices and facilities that users may wish to control may include audio equipment, video equipment, lamps, air purification facilities, power outlets, and the like. It may be desirable for the user to control these devices and facilities from the adjustable bed without having to leave the bed or ask for aid from someone else. For example, the user may be confined to the bed and may want the simple ability to control the lights around the adjustable bed.

Ex. 1 at 9:13-23 (emphasis added), 1:32-36, 1:54-59, 9:28-33. Tempur's proposed construction reflects the intrinsic record and should be adopted.

### G.    "The Row Representing."

| Claim Term | Tempur's Proposed Construction |
|---|---|
| "the row representing a position of an adjustable bed" (Claims 1, 21, 33, 40 of the '116 Patent) | "the row representing a preset position of the adjustable bed" |
| "the row representing the user-selected bed position" (Claim 1 of the '934 Patent) | "the row representing the user-selected preset bed position" |

Tempur's construction for the above terms adds "preset" because preset positions are the only positions disclosed by the intrinsic record. For example, during the '934 Patent's prosecution (relevant to both claims as they are part of the same Family Patents) the patentee explains the entirety of the invention as follows:

> By allocating a ***row of a table to a particular user-selected bed position***, and by ***storing*** in that location an increment value that is directly realizable by an actuator, the processing and memory footprint for position recall is usefully minimized for implementation with minimal control circuitry.

Ex. 2 at 8 (emphasis added). Accordingly, the invention stores preset positions in data table rows so that "recall of mechanical positions [is done] with reduced storage and processing requirements." *Id*.

Likewise, the specification confirms Tempur's construction. Figure 2 and the specification provide two ways for storing positions. "[A] first method may be to have discreet memory table 202 for each preferred user bed position 204." Ex. 1 at 22:33-35. "[A] second method of memory storage for user preferred adjustable bed positions may be a table 222 that may have a plurality of possible positions 212 the user may select." *Id*. at 22:47-50. Accordingly, any recall of a position

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**                    17

from one of these data tables is the recall of a preset position since it was already previously stored in a row of the table.

The claim language also supports Tempur's proposal. In claim 1 of the '116 Patent, the second limitation provides "identifying a row in a data table, *the row representing a position of the adjustable bed*." The next two limitations require "within the row, *identifying* an increment value specifying an available position of the adjustable bed; and causing a component of the adjustable bed to *meet the increment value*." Therefore, claims confirm that the recalled position is preset.

### H.   "Wood."

Tempur's proposed construction for "wood" in claims 1, 13, 14, and 25 of the '366 Patent as "solid wood, oriented strand board, or plywood" comes directly from the specification.  In the claims, "wood" is the material disclosed for one or more of the following: the base frame, the head board, and the foot and back deck. The specification states that "the base frame may be made from wood." Ex. 5 at 48:38 ('366 Patent). The patent goes on to explain that "foundation materials" (which includes the base frame, headboard, and foot and back deck) may be made of "oriented strand board (OSB)" and "plywood." *Id.* at 48:58-63. The specification also explains that "an adjustable bed facility 102 may comprise standard flat foundation materials. For example, the adjustable bed facility 102 may comprise wood strapping and 2x4s." *Id.* at 49:8-10. Both wood strapping and

2x4s are cuts of solid wood. Tempur's proposal thus reflects the intrinsic record.

### I.     Claimed Design of the D553 Patent.

| Tempur's Proposed Construction |
|---|
| "The ornamental design for an adjustable bed, as shown and described in Figures 1-2, where the head segment of the top body support portion is thinner than the foot segment of the top body support portion, where the head segment of the top body support portion overhangs the head portion of the bottom frame portion, where the sides of the head, torso, leg, and foot segments of the top body support portion do not overhang the bottom frame portion, where the foot segment of the top body support portion does not overhang the foot portion of the bottom frame portion, and where the bottom frame portion is a closed frame." |

Design patents, although claiming an ornamental design, are subject to claim construction. *See Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995). The Federal Circuit has blessed constructions "where the court helped the fact finder distinguish between those features of the claimed design that are ornamental and those that are purely functional." S*port Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (quotation omitted).

Tempur's construction reflects the ornamental features of the D553 Patent.[3] The first part of Tempur's proposal states that the head segment of the top body support portion is thinner than the foot segment of the top body support portion:



Head segment of top body support portion

Bottom frame portion

Foot segment of top body support portion

FIG. 1                    FIG. 2

---

[3] The D553 Patent states "[t]he broken lines [in the figures] are for environmental purposes only and form no part of the claimed design." Ex. 6 (D553 Patent).

The above illustrations of the D553 Patent show the difference in the top body support portion captured by Tempur's proposal.  The patentee also stated during prosecution that "[t]he claimed design has a top portion with four segments that are quite thin, with each segment having *substantially* the same thickness." Ex. 7 at 5 (August 22, 2014 D553 Patent Office Action Response). The patentee did not say that each segment was the *same* thickness, but only substantially the same, which does not change the fact that the head segment is thinner than the foot segment. In distinguishing the prior art reference *Antinori*, the patentee explained that the thickness of all four segments of *Antinori's* top body support portion were overall much thicker than the claimed design and therefore distinguishable. The patentee's position regarding the relative thickness of the head segment versus the foot segment remained unchanged. Even now, Reverie's proposed construction is "substantially same thickness," which concedes that the top portion is not uniform. As such, the ornamental design of the top body support portion should be construed consistent with the illustrations, with the head thinner than the foot.

The next part of Tempur's proposed construction addresses the overhang of the top body support portion over the bottom frame portion. To overcome a rejection during prosecution regarding *Antinori*, the patentee explained that

> *In the claimed design*, on the other hand, *the upper and lower portions have nearly identical lengths, giving an appearance of a unified whole*. In Antinori, it appears that an upper support portion is *stacked on top* of a lower portion, which it *overhangs dramatically*.

This gives the appearance of *two distinct structures rather than a unified whole*.

Ex. 8 at 6-7 (May 12, 2014 D553 Patent Office Action Response) (emphasis added), 10-11 (same); Ex. 7 at 5 (same). Thus, the patentee disclaimed dramatic overhang or stacking of the top body support portion over the bottom frame portion. The patentee clearly expressed that the bed would have a unified appearance, except for a slight overhang at the head of the bed. In other words, all edges align between the top and bottom portions except for at the head.

Lastly, the parties agree that the bottom frame portion is a closed frame.

## IV.   INDEFINITENESS.

Claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112(b). Whether a claim meets this requirement is a matter of law. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007). A claim is invalid as indefinite when its language, read in light of the specification and prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

### A.   "A Controller of the Component" and "The Controller."

These terms respectively appear in claims 2 and 4 of the '932 Patent. Claim 2 depends from asserted claim 1 and claim 4 depends from claim 2. Claim 2 recites "a controller of the component of the adjustable bed," but there is no antecedent

basis for "*the* component" in claim 1. In other words, claim 1 must recite "*a* component" in order for claim 2 to have an antecedent basis for "*the* component." As Figure 1 and the specification shows, there are numerous components in claim 1, but no connection between them and "the component" of claim 2. *See* Ex. 9 at 8:54-55 ('934 Patent) ("FIG. 1 shows a block diagram of an adjustable bed facility and associated components."), 10:17-18 (same). *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (claim indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication). Since a person of ordinary skill in the art cannot reasonably ascertain the scope of claim 2, it is indefinite. Additionally, claim 4 depends from claim 2, but "the controller" in claim 4 does not have proper antecedent basis. Because "the controller of the component" in claim 2 is indefinite, claim 4 is likewise indefinite.

### B.    "Control Command."

This term appears in claim 6 of the '934 Patent and violates the rule of claim differentiation. Claim 6 depends from asserted claim 1. Claim 1 provides for "a control command from a user, the control command directed to recalling a user-selected bed position of the adjustable bed." Thus, claim 1 requires that the control command is a user command. Claim 6 redundantly requires that "the control command is a user command." "[A] dependent claim must add a limitation to those recited in the independent claim." *Curtiss-Wright Flow Control Corp. v.*

*Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006); *see* 35 U.S.C. § 112(d). Failure to do so "would not only make that additional limitation superfluous, it might render the dependent claim invalid." *Curtiss*, 438 F.3d at 1380. Because claim 6 does not add to claim 1, it is indefinite.

### C.     "Mechanically Controlled."

This term appears in claim 7 of the '934 Patent and depends from claim 1. Claim 1 requires "an actuator mechanically coupled to a movable section of the adjustable bed" and "controlling the actuator ... by moving the actuator a number of increments." But claim 7 requires "one or more articulating portions mechanically controlled by the actuator." Thus, claim 7 is a redundant disclosure of claim 1, and is therefore indefinite.

### D.     "The Position Recall Command."

This term appears in claim 1 of the '328 Patent. But the term has no antecedent basis. To properly have an antecedent basis, there should be an "a position recall command," but none exists. The claim therefore is indefinite.

### E.     "Optionally One or More."

This term appears in claim 1 of the '357 Patent. The claim states "optionally one or more of" and then lists a number of possible feedback communications. However, by using "optionally one or more" the claim is indefinite because one of ordinary skill cannot determine the bounds of the alleged invention. *See Hockeyline, Inc. v. Stats, LLC*, No. 1:13-cv-1446, 2013 WL 11091886, at *6

(S.D.N.Y. Dec. 16, 2013) (invaliding claim for using "optionally provides" because the "optional" clause is "superfluous, since it may or may not be part of the invention"), *aff'd*, 670 F. App'x 703 (Fed. Cir. 2016).

### F.   "Substantially Flat" and "Substantially Raised."

These terms are both used identically in claims 1 and 25 of the '366 Patent. Claim 1 states "the adjustable head board operable to move from a ***substantially flat*** to at least one ***substantially raised*** position relative to the stationary deck." "Definiteness problems often arise when words of degree are used in a claim." *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). "When a word of degree [like substantially] is used the district court must determine whether the patent's specification provides some standard for measuring that degree." *Id*. In other words, the claims "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (quotation omitted).

Here, neither the claims, specification, nor prosecution history provide any guidance on how flat or raised the head board must be to qualify as "substantially flat" or "substantially raised." Without that guidance, the claims are indefinite.

Other claims in the '366 Patent confirm that the "substantially" terms are indefinite. For instance, claim 14 requires "an adjustable head board operable to be raised from a ***flat*** position to at least one ***raised*** position." Thus, the patentee knew

how to claim a flat position and a raised position, but did not in claims 1 or 25. Since the patentee used "substantially flat" and "substantially raised" in claims 1 and 25, those terms must have specific boundaries from the use of "flat" and "raised" in claim 14. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("Our precedent instructs that different claim terms are presumed to have different meanings."). Because they do not, they are indefinite. *See Ex Parte Lazzara*, Appeal No. 2007-0192, 2007 WL 5963473 (BPAI Nov. 13, 2007) (finding "substantially uniform array of irregularities" indefinite); Ex. 10 (*Invitrogen Corp. v. Clontech Labs.*, No. 8:96-cv-4080, Slip Op. Dkt. No. 334 at 13-16 (D. Md. May 4, 2001) (invalidating 178 claims reciting "substantially reduced RNase H activity" as indefinite under § 112)).

Dated: June 2, 2017

Respectfully submitted,

/s/ *Steve Schortgen*
Steve Schortgen
  steve.schortgen@klgates.com
  **K&L GATES LLP**
1717 Main St., Suite 2800
Dallas, TX  75201400
Tel.: (214) 939-5500
Fax: (214) 939-5849

Michael P. Cooney
  mcooney@dykema.com
Andrew J. Kolozsvary
  akolozsvary@dykema.com
  **DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI 48243
Tel: (313) 568-6800
Fax: (313) 568-6701

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have appeared in this case are being served today with a copy of the foregoing DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF via the Court's CM/ECF system on this 2nd day of June, 2017.

/s/ *Steve Schortgen*
Steve Schortgen