UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| ASCION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | 5:17-cv-403-JMH |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| TEMPUR SEALY INTERNATIONAL, | ) | **AND ORDER** |
| INC., et al., | ) | **ON CLAIM CONSTRUCTION** |
| | ) | |
| Defendants. | ) | |

\*\*\*

This matter is before the Court for claim construction. The parties have submitted briefs in support of their proposed claim constructions. Additionally, a *Markman* hearing on this matter was held on December 11, 2017. [DE 121]. The Court's findings are described below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In this patent case, Plaintiff Ascion, LLC ("Reverie") brings infringement claims against Defendant Tempur Sealy International, Inc. and Tempur-Pedic Management, LLC (collectively "Tempur"), alleging infringement of 31 claims across seven patents related to adjustable bed frames, mattresses, and accessories. This action was originally filed in the United States District Court for the Eastern District of Michigan, before being transferred to this Court on October 16, 2017. [DEs 88, 89].

1

Presently before the Court is the task of claim construction with respect to 21 disputed claims contained in the patents. Notably, prior to being transferred, Judge Denise Page Hood of the Eastern District of Michigan found that construction of 21 claims (four of which both parties sought to address, plus an additional 17 identified by Tempur) was "reasonable in light of the fact that Plaintiff has asserted seven patents and 31 claims across those patents." [DE 87 at 5].

On December 11, 2017, the Court conducted a *Markman* hearing, at which the parties presented oral argument in support of their claim construction contentions. [DE 121]. Prior to the hearing, the parties submitted claim construction briefs with voluminous documentary exhibits. [DEs 50, 56, 61; DEs 51, 57, 62].

The patents at issue are as follows: U.S. Patent Nos. 8,682,457 ("the '457 Patent"); 8,909,357 ("the '357 Patent"); 8,046,116 ("the '116 Patent"); 8,565,934 ("the '934 Patent"); 9,044,366 ("the '366 Patent"); 8,869,328 ("the '328 Patent"); and U.S. Design Patent No. D720,553 ("the 'D553 Patent").

## A. PATENTS AT ISSUE

### 1. The '457 Patent

The '457 Patent, filed in 2011, relates to the wireless control of an adjustable bed. [DE 50-3; DE 51-5]. It is part of what Tempur has called the "Family of Patents," which also includes

2

the '328, '116, and '934 Patents. These patents all share similar specifications.

## 2. The '328 Patent

The '328 Patent, filed in 2007, also relates to the wireless control of an adjustable bed. [DE 50-8]. More specifically, however, it deals with a two-way wireless communication system "adapted to" communicate between a handheld remote control and the adjustable bed controller. [*Id.*]. This '328 Patent is part of the "Family of Patents" that share identical specification and common file histories.

## 3. The '116 Patent

The '116 Patent relates to the wireless control of an adjustable bed that is associated with a second system, in which both the bed and the second system are controlled by a modular control system. [DE 50-5; DE 51-2]. Filed in 2007, the '116 Patent is part of the patent group, repeatedly referred to as the "Family of Patents," which share identical specification and histories.

## 4. The '934 Patent

The '934 Patent is the last of the "Family of Patents" which relate to the wireless control of adjustable beds and share identical specification and histories. The '934 Patent, which was also filed in 2007, deals specifically with the touch screen

control of an adjustable bed and the storage of bed positions in memory. [DE 50-6; DE 51-10].

## 5. The '357 Patent

The '357 Patent, filed in 2012, is unrelated to the "Family of Patents," however, it also covers the usage of a remote control to adjust side-by-side bed foundations. [DE 50-4]. The Abstract for this patent explains that it "concerns a communication system adapted to communicate between a handheld remote control and a first adjustable bed controller of a first adjustable bed facility, and a second communication system adapted to communicate" between the two controllers. [DE 50-4 at 2].

## 6. The '366 Patent

The '366 Patent concerns adjustable mattress support facility, or an adjustable bed with a deck-on-deck appearance. More precisely, this patent covers a specific orientation for the metal support structure of an adjustable bed foundation. [DE 50-7; DE 51-6]. The '366 Patent was filed in 2014.

**7. The D553 Patent**

Finally, the D553 Patent involves a specific ornamental adjustable bed design. [DEs 50 at 11; 51 at 6]. Accordingly, the following figures demonstrate the appearance of D553:



FIG. 1                          FIG. 2

[DE 50-9; DE 51-7].

**B. CLAIM TERMS AT ISSUE**

| Disputed Terms, Phrases, or Clauses | Patent(s) | Claim(s) |
|---|---|---|
| "increment value" | '116 | 1, 21, 33, 40 |
|  | '934 | 1 |
| "value representative of an acceptable value" | '457 | 23 |
| "an actuator position" | '328 | 1, 13 |
| "capable of two-way wireless communication with" | '457 | 20 |
| "two-way wireless communication system" | '457 | 20 |
| "two-way wireless communication system adapted to communicate" | '328 | 1, 13 |
| "initiate a communication from the adjustable bed controller to the handheld remote control" | '328 | 1, 13 |

5

| | | |
|---|---|---|
| "providing feedback to a user on the handheld remote control to indicate the success of the command" | '457 | 20 |
| "code key indicating that commands can be received and executed therebetween" | '457 | 20 |
| "unique communication link" | '934 | 1 |
| "second system" | '116 | 1, 21, 33, 40 |
| "the row representing a position of an adjustable bed" | '116 | 1, 21, 33, 40 |
| "the row representing the user-selected bed position" | '934 | 1 |
| "wood" | '366 | 1, 13, 14, 25 |
| "a controller of the component" | '934 | 2 |
| "the controller" | '934 | 4 |
| "control command" | '934 | 6 |
| "mechanically controlled" | '934 | 7 |
| "the position recall command" | '328 | 1 |
| "optionally one or more" | '357 | 1 |
| "substantially flat" and "substantially raised" | '366 | 1, 25 |

In addition to the above claim terms at issue, the parties also dispute the claimed design of the D553 Patent.

## II. STANDARD OF REVIEW

Claim construction is an issue of law. *See Markman v. West View Instruments, Inc.*, 517 U.S. 370, 388-90 (1996). "The appropriate starting point [...] is always with the language of the asserted claim itself." *Comark Comm, Inv. V. Harris Corp.*, 156 F.3d 1186 (Fed. Cir. 1998). "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."

6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

Claim terms "are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). It is the claims that measure the invention. *SRI Int'l Matushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

In the event of ambiguity regarding claim terms, courts must first look to the intrinsic evidence—that is, the claim itself, the specifications, the prosecution history, and prior art cited in the patent—to resolve any ambiguities. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005), the Federal Circuit provided guidance on the hierarchy of evidentiary sources for claim construction. First, "the claims themselves provide substantial guidance as to the meaning of particular terms." *Id.* at 1314.

Second, the claims "must be read in view of the specification." *Id.* "The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Conceptronic, Inc.*, 90 F.3d at 1582. Indeed, "[w]hen the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search

further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

Third, a court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

Thus, the claims, specification, and prosecution history are "intrinsic evidence" and are the favored sources for claim construction. *Phillips*, 415 F.3d at 1317. In most circumstances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583.

However, if intrinsic evidence does not resolve ambiguities, courts may also look to extrinsic evidence. While extrinsic evidence "can shed light on the relevant art," such evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language." *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)); *Phillips*, 415 F.3d at 1317.

Nevertheless, claim construction always begins with the language of the claim and asks "how a person of ordinary skill in the art understands a claim term." *Phillips*, 415 F.3d at 1317-18;

8

1224. A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the dispute term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

## III. DISCUSSION

Given the number of claims and terms at issue, the Court will separate its analysis into four categories. First, the Court will consider the four terms which both parties have offered proposed constructions for. Next, the Court will consider the remaining terms which Tempur has proposed its own constructions for. Third, the Court will consider the claims that Tempur has raised challenges of indefiniteness against. Finally, the Court will discuss the claimed design of the D553 Patent.

## A. TERMS BOTH PARTIES SEEK TO CONSTRUCT

## 1. "two-way wireless communication" ('457 Patent, Claim 20; '328 Patent, Claims 1, 13)

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| A system in which each node is able to, but need not, directly or indirectly transmit and receive a wireless signal. The wireless signal may include, but is not limited to, infrared (IR), wireless USB (WUSB), ultrawideband (UWB), radio frequency (RF), cellular, Wi-Fi (IEEE 802.11), and Bluetooth signals or communication protocols | **["capable of two-way wireless communication with", '457 Patent]:** Wirelessly communicating back and forth with |
| | **["two-way wireless communication system," '457 Patent]:** System for wirelessly communicating back and forth between the controller and the handheld remote control |
| | **["two-way wireless communication system adapted to communicate," '328 Patent]:** System for wirelessly communicating back and forth |

This term appears in two separate patents. In Claim 20 of the '457 Patent, this term appears in the phrase "the controller capable of two-way wireless communication with a handheld remote control." [DE 1-2 at 38]. It is also asserted in Claims 1 and 13 of the '328 Patent, which provide "a two-way wireless communication system adapted to communicate between a handheld remote control and an adjustable bed controller; the handheld remote control having a user interface adapted to initiate a transmission of a

10

preset recall command from the handheld remote control to the adjustable bed controller using the two-way wireless communication system to return to a present recall position." [DE 1-7 at 37]. To provide greater context, Claim 20 of the '457 Patent states:

> A system comprising: an adjustable bed having machine-adjustable articulated portions; a controller for the adjustable bed, the controller including a wireless interface, the controller *capable of two-way wireless communication with a handheld remote control*, wherein the handheld remote control is communication matched to the adjustable bed controller with a code key indicating that commands can be received and executed therebetween; and the handheld remote control *capable of: transmitting a control signal to the adjustable bed controller using the two-way wireless communication system*; and providing feedback to a user on the handheld remote control to indicate the success of the command.

[DE 1-2 at 38, Claim 20 of the '457 Patent (emphasis added)].

Reverie proposes a construction involving three components. First, Reverie's construction lists examples of various communications protocols that could be used for two-way wireless communication. [DE 50 at 14]. Reverie maintains that this is necessary because "two-way wireless communication" is not limited to any one specific communication technology. [*Id.*].

Tempur contends that Reverie's list of communication protocols is overbroad and that it inappropriately imports embodiments into its proposed construction. [DE 56 at 8]. The Court agrees that the inclusion of these embodiments is unnecessary to the interpretation of the term at issue, but not for the reason that Tempur has argued. While Tempur acknowledges that the patents

11

contemplate communication by radio frequency, infrared, and Bluetooth, it reads the claim as limited to only those methods. [DE 56 at 8-9]. This ignores communications by "the like," including cellular and Wi-Fi connections which are utilized by cell phones or smart phones. Notably, these are implicated by the '457 Patent specification, explaining that "the cellular communication may utilize a cell phone, a smart phone, or the like to provide the communication method with the control box 134." [DE 51-5 at 24].

Reverie proposes that the communication between the controller and the remote need not be direct, and instead, may be routed through an intermediary, like a Wi-Fi router. [DE 50 at 15]. Reverie points to the specification and several embodiments as evidence of this. The Court agrees. The '457 Patent, for example, teaches that "[t]he various controlled functions (e.g. actuators 104 or external devices) may be able to communicate using the wireless technology, may use an intermediate wireless receiver, or the like to communicate with the control box 134." [DE 1-2 at 24]. Moreover, particularly with regard to utilizing cell phones or smart phones, cellular communications necessarily rely on intermediaries to establish bidirectional communications— something easily understood by a person of ordinary skill in the art. This function is also described in the '457 Patent specification, teaching that "the wireless technology may include

12

Bluetooth, ultra-wideband (UWB), wireless USB (WUSB), IEEE 802.11, cellular, or the like. [DE 50-8 at 24].

Reverie's proposed construction states that the system be "able to, but need not" communicate by two-way wireless protocols. [DE 50 at 15]. Reverie argues that its proposed construction is consistent with the patent specifications because the specifications use the permissive word "may" each time they discuss such communication. [DE 50 at 13]. Reverie explains that its construction flows directly from claim terms "capable of" and "adapted to," as used in Claim 20 of the '457 Patent and Claim 1 of the '328 Patent, respectively. [*Id.* at 15-18]. Reverie also points to the specifications in the patents where the permissive word "may" is used. For example, the specifications in the '328 Patent state that, "[i]n an embodiment, the remote *may* communicate to the receiver 130 and the receiver *may* transmit the received user command request to the control box 134," and "the control box 134 *may* interface with the receiver 130, remote 148." [*Id.* at 17 (emphasis added)].

Tempur argues that the plain language of the claims, functionality, and prosecution history contradict Reverie's optionality argument. [DE 56 at 14-15]. On this point, the Court agrees with Tempur.

Reverie's proposal thus makes the two-way wireless communication function optional. In a vacuum, the terms "capable

13

of" and "adapted to" may be permissive. However, in light of the entirety of the patent claims, it is clear that bidirectional communication is a necessary component of "two-way wireless communication with a handheld remote control, wherein the handheld remote control is communication matched to the adjustable bed controller with a code key indicating that commands be *received and executed* therebetween." [DE 1-2 at 38, Claim 20 of the '457 Patent (emphasis added)]. That is, the language and intrinsic record demonstrate that the system *must* have the ability to communicate between the remote control and the bed controller; it is not enough to simply have the ability to do so. Notably, other courts have also found that "capable of" does not imply an optional function. *See, e.g., Andover Healthcare, Inc. v. 3M Co.,* No. 13-cv-843, 2015 WL 2227786, at *5 (D. Del. May 11, 2015); *Raytheon Co. v. Indigo Sys. Corp.,* 682 F. Supp. 2d 717, 713 (E.D. Tex. 2010).

Accordingly, the Court adopts the following construction: "a system for wirelessly communicating back and forth, either directly or indirectly."

**2. "code key" ('457 Patent, Claim 20); "unique communication link"**

**('934 Patent, Claim 1)**

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| **["code key"]:** Any indicator that allows a remote control to pair with an adjustable bed controller<br><br>**["unique communication link"]:** Plain and Ordinary Meaning | Unique identifier included at the beginning of, the end of, or as part of the transmission of a control command |

Generally, this term refers to a type of indicator, or identifier, that connects the remote control with the adjustable bed. As relevant to the term "code key," Claim 20 of the '457 Patent states:

> A system comprising: an adjustable bed having machine-adjustable articulated portions; a controller for the adjustable bed, the controller including a wireless interface, the controller capable of two-way wireless communication with a handheld remote control, wherein the handheld remote control is communication matched to the adjustable bed controller with a *code key* indicating that commands can be received and executed therebetween; and the handheld remote control capable of: transmitting a control signal to the adjustable bed controller using the two-way wireless communication system; and providing feedback to a user on the handheld remote control to indicate the success of the command.

[DE 1-2 at 38, Claim 20 of the '457 Patent (emphasis added)].

Reverie argues that the only construction that is consistent with the claim wording, specification, and prosecution history of the '457 Patent is "any indicator that allows a remote control to pair with an adjustable bed controller." [DE 50 at 18].

Tempur counters, suggesting that Reverie's construction is both overbroad and redundant of the rest of Claim 20 of the '457 Patent. Specifically, Tempur maintains that the '457 Patent requires that "the handheld remote control is communication matched to the adjustable bed controller with a code key indicating that commands can be received and executed therebetween." [DE 56 at 19 (citing Claim 20 of the '457 Patent)]. As such, Tempur suggests that "any indicator" is overly broad and provides no guidance as to what a "code key" is or how it actually operates. [*Id.*]. Tempur maintains that the second part of Reveries' proposed construction ("that allows a remote control to pair with an adjustable bed controller") is redundant of the claim language. [*Id.*]. This, Tempur explains, essentially reads out "code key" from the claim by reiterating the surrounding language of Claim 20 without providing an understanding of what or how the "code key" operates. [*Id.* at 19-20].

The Court agrees with Defendant in part. Replacing "code key" with Reverie's construction would read as follows: "wherein the handheld remote control is communication matched to the adjustable bed controller with [*any indicator that allows a remote control to pair with an adjustable bed controller*] indicating that commands can be received and executed therebetween." [DE 1-2 at 38 (emphasis added)]. While the description may still be accurate, the redundancy in the terms provides no additional clarity as to what

16

the "code key" is, or how it functions. However, Tempur's construction, also problematically turns Claim 20 into a method claim, rather than a system claim, in its description of how and when the code key is transmitted. *See, e.g., Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293, 1301 (Fed. Cir. 2011); *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008).

Nevertheless, the Court finds that construing "code key" to mean "unique identifier" provides additional clarity to what the "code key" actually is, without dictating how and when it is transmitted. This construction may be more helpful to a jury, without limiting or broadening the scope of the patent claim.

Tempur also argues that "unique communication link" as described in Claim 1 of the '934 Patent should follow suit and be constructed synonymously with "code key." [DE 51 at 18]. Reverie, on the other hand, suggests that the plain language is sufficient for this term, as it is separate from "code key." The Court agrees. The specification of the '934 Patent teaches that the "unique communication link" may be established through a variety of ways, including, but not limited to, a code key. [DE 50-6 at 24, 35]. Moreover, the '934 Patent's use of "code key" and "unique communication link" clearly demonstrates they are not synonymous. [DE 57 at 15]. Therefore, no construction is needed for "unique communication link."

17

### 3. "the adjustable bed controller further adapted to initiate a communication from the adjustable bed controller to the handheld remote control to indicate that the adjustable bed controller has responded to the position recall command" ('328 Patent, Claims 1, 13)

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| The adjustable bed controller is able to, but need not, indicate to the remote control that it has responded to the position recall command | The adjustable bed controller further adapted to initiate a communication from the adjustable bed controller to the handheld remote control to indicate that the adjustable bed controller has successfully completed the position recall command |

The dispute over this phrase is similar to the one involving "two-way communication," in that the parties disagree as to whether the bed controller may or may not indicate to the remote control that it has responded to the position recall command. As before, Tempur contends that the bed controller must have this function. [DE 56 at 22-26]. Reverie, on the other hand, maintains that the term "adapted to" provides that the controller be able to, but need not utilize this function. [DE 50 at 21-23]. For similar reasons as explained above, the Court agrees with Tempur on this point.

Although "adapted to" has been read by some courts in other contexts to align with "capable of," in a permissive-sense, the patent specification and intrinsic evidence support Tempur's

18

reading. That is, "adapted to," in this context, indicates that the controller does in fact utilize the described function. It is not enough that it simply has the ability to do so, and then does not. "Adapted to" must be more than a permissive or optional capability here. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012); *Boston Scientific Corp. v. Cordis Corp.*, 2006 WL 3782840, at *3 (N.D. Cal. Dec. 20, 2006).

Notwithstanding, the Court disagrees with Tempur on whether the function is limited to "successful" completion. As Reverie correctly points out, the '328 Patent specification provides that the communication from the adjustable bed controller to the remote control can indicate success or lack of success. [DE 50 at 23]. Specifically, it teaches that the feedback may indicate "that the command was successful, failed, is in progress, in conflict with a command in progress, failed for safety reasons, or the like." [DE 50-8 at 35]. Thus, while the patent contemplates successful completion of a command as part of its main function, and must be able to communicate such, the communication need not necessarily be limited to success alone. In this manner, "responded to" should not be rewritten to mean "successfully completed." *See Phoenix Licensing, LLC v. Advance Am.*, No. 2:15-CV-1367, 2016 WL 6217180, at *26-30 (E.D. Tex. Oct. 25, 2016).

Accordingly, the Court finds that neither party's construction is proper; and that the plain language, where "adapted to" is construed as a mandatory function, is sufficient.

**4. "wood" ('366 Patent, Claims 1, 10, 13, 14, 25)**

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| Wood products, including wood cut from a log and engineered or composite wood | Solid wood, oriented strand board, or plywood |

Claim 1 of the '366 Patent is directed to "[a]n adjustable mattress support facility" that comprises, among other components, "a wood base frame." [DE 50-7 at 104]. The other asserted claims, including Claims 10, 13, 14, and 25 use the term in the context of "a wood base frame," or "the frame, the head board, and the foot and back deck being formed of wood." [*Id.* at 104-105; DE 50 at 24].

The parties agree that the term "wood" includes solid wood cut from a log, oriented strand board, and plywood; however, they disagree as to whether the term extends beyond what Tempur has proposed. [DEs 50 at 24-28; 56 at 26-29]. Specifically, Tempur argues that its proposed construction adequately includes the types of wood that are mentioned in the specification. [DE 56 at 26-29]. Tempur continues by stating that the term "wood" should be limited to these examples, and that any other type of wood would unreasonably expand the scope of the '366 Patent. [*Id.* at 27-29].

Reverie agrees that "wood" includes the types identified by Tempur. [DE 50 at 24]. Nevertheless, Reverie argues that the phrase "such as" and "and the like" expand beyond these examples to include other types of engineered or composite woods. [*Id.* at 25].

The Court agrees with Reverie. As Reverie points out, the '366 Patent specification explains that the adjustable bed frame may consist of "foundation materials, such as oriented strand board (OSB), plywood, and the like." [DE 50 at 25, citing '366 Patent at 48:58-61]. Although Tempur has cautioned against broadening the scope of the term "wood," Reverie's construction does not. In fact, "engineered or composite wood," appears to fully encompass the examples listed in the '366 Patent, like plywood and OSB. Moreover, Reverie's construction is consistent with the '366 Patent because the phrases "such as" and "and the like," in the context of the term "wood," are not meant to be overly limited to just the specifically identified examples of plywood and OSB; rather, it is meant to include other types of woods similar to plywood and OSB. Consequently, the Court adopts the following construction: natural wood, and engineered or composite wood.

## B. ADDITIONAL CONSTRUCTIONS PROPOSED BY TEMPUR

In addition to the terms above with competing constructions by the parties, Tempur has proposed the following terms. Reverie has argued that the plain meaning is clear. Thus, the dispute

around the following terms is whether or not construction is
necessary at all.

**1. "increment value," ('116 Patent, Claims 1, 21, 33, 40; '934
Patent, Claim 1); "value representative of an acceptable value,"
('457 Patent, Claim 23); and "an actuator position"('328 Patent,
Claims 1, 13)**

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | **["increment value," '116 Patent, Claims 1, 21, 33, 40; '934 Patent, Claim 1]:** Increment angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator<br><br>**["value representative of an acceptable value," '457 Patent, Claim 23]:** Value representative of an acceptable angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator<br><br>**["an actuator position," '328 Patent, Claims 1, 13]:** An angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator |

These terms relate to the storage of bed position information.
The parties' disagreement stems from whether the phrase should be
read uniformly or whether each should be afforded a distinct

construction. In addition, the parties dispute the extent that intrinsic evidence should come into play, or whether the plaining meaning alone is sufficient.

Temper contends these overlapping terms and constructions should be read in conjunction with one another because they are used in the same manner and context across each of the relevant patents. [DE 51 at 3]. Reverie argues that Tempur's construction must be rejected because it conflates three distinct terms. [DE 57 at 16]. Reverie maintains that the phrase "increment value," as used in the '116 and '934 Patents, is a term for values stored in memory to represent bed position or vibration motor setting. [*Id.* at 9]. According to Reverie, these "increment values" may be a measurement scale, a number of rotations of the actuator, the vibration frequency of the vibration motor, or other increment scale, but are not limited to bed position. [*Id.*].

The Court agrees with Tempur. Despite Reverie's attempt to differentiate the three claims terms, a reading of the terms shows that they are all refer to information stored for bed positions. As Tempur points out, "increment value" is used in the '116 and '934 Patents address storage of bed position data. [DE 62 at 7]. For example, the '116 Patent and '934 Patent specifications teach that: "the available positions 212 may be a set of increments of section positions that may include a set of actuator 104 positions, a set of actuator 104 activation times, bed section rotation

Case: 5:17-cv-00403-JMH   Doc #: 136   Filed: 07/28/21   Page: 24 of 44 - Page ID#: 4298

angles, or the like." [DE 51-2 at 23 ('116 Patent); DE 51-10 at 26-27 ('934 Patent)]. Similarly, the term "an actuator position," from the '328 Patent claims, is used in much the same way that "increment value" is used in the '116 and '934 Patents. [DE 62 at 7; DE 50-8 at 37-38].

Reverie argues that Tempur attempts to read in unsupported limitations to the term "value representative of an acceptable value" in the '457 Patent. [DE 57 at 10]. However, Reverie concludes by referring to it as "an increment value related to position." [*Id.*]. As Tempur points out, this actually tends to support its argument that this term be read in the same manner as the other value-related terms in the '116, '934, and '328 Patents. [DE 62 at 7-8].

Finally, Reverie insists that disclaimer is inapplicable because the patentee distinguished the invention form prior art, rather than disclaiming the scope. [DE 57 at 19]. Reverie attempts to argue that there is a difference between disavowing scope and distinguishing from prior art; and, while true, the prosecution history of the '934 Patent suggests that the patentee disavowed internal or external clock or counter increments in distinguishing the '934 Patent from U.S Patent No. 6,681,425 (referred to as "*Leventhal*"). Specifically, the patentee argued that under *Leventhal*'s approach, a processor, at a minimum, must "independently operate 'an internal or external clock or counter.'

24

By contrast, the claimed invention [the '934 Patent] stores actuator values directly so that a control signal can be issued directly to the corresponding hardware." [DE 51-3 at 9-10]. "By allocating a row of a table to a particular user-selected bed position, and by storing in that location an increment value that is directly realizable by an actuator, the processing and memory footprint for position recall is usefully minimized for implementation with minimal control circuitry." [*Id.*]. Thus, in order to avoid prior art, the patentee disclaimed measurement by clock or counter. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).

As the patentee made clear, the actuator must be able to act upon the stored value directly, without further analysis, including without being measured by either clock or counter. As Tempur explains, any value stored as actuator operation time or extension distance would require measurement by clock or counter. [DE 51 at 9]. Consequently, given the prosecution history and the patentee's disclaimer, the only remaining disclosed option of measurement is by the angle of rotation. Accordingly, the Court adopts Tempur's construction of all three terms.

## 2. "second system" ('116 Patent, Claims 1, 21, 33, 40)

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | System peripheral to the adjustable bed |

The dispute concerning the term "second system" essentially boils down to where the second system is located, or how it is associated with the adjustable bed.

Tempur argues that "second system" be construed as a "system peripheral to the adjustable bed," or separate from the adjustable bed. [DE 51 at 18]. Reverie maintains that the term "peripheral" leads to more confusion and includes a limitation on the claims. [DE 57 at 10-11]. Accordingly, Reverie contends that the plain meaning of the term "second system" is sufficiently clear and indicates that the system need not be entirely separate from the adjustable bed. [*Id.*]. The Court agrees.

The term "peripheral" seems to suggest that the second system be located apart from the adjustable bed. To be sure, the second system is a separate system, to the extent that it functions independent of the first system. On this point, both parties seem to agree. However, simply because the second system has functions different from the first system does not necessarily mean it must be located separate from the adjustable bed. While it is true that the '116 Patent specification allows for the second system to be separate from the adjustable bed, it does not require it. [DE 51-

2 at 26]. It is enough that the second system merely be associated with the adjustable bed.

The term "associated with" requires commonality and does not address the location or physical connection. *See Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 Fed. Appx. 1030, 1033-34 (Fed. Cir. 2016). This is consistent with the '116 Patent specification, which, for example, teaches that the air purification facility "may be part of the adjustable bed facility 102, a freestanding device or facility, or the like." [DE 57 at 11]. Thus, the '116 Patent provides that the second system could be within the adjustable bed itself or separate from it, as long as it is associated with the adjustable bed.

Accordingly, the Court agrees with Reverie that the term "second system" requires no further construction beyond its plain meaning.

## 3. "the row representing" ('116 Patent, Claims 1, 21, 33, 40; '934 Patent, Claim 1)

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | **["the row representing a position of an adjustable bed," '116 Patent]:** The row representing a preset position of the adjustable bed |
| | **["the row representing the user-selected bed position," '934 Patent]:** The row representing the user-selected preset bed position |

27

Tempur calls for the addition of the word "preset" to the language of the '116 and '934 Patents to read "the row representing a *preset* position of the adjustable bed," in Claims 1, 21, 33, and 40 of the '116 Patent; and "the row representing the user-selected *preset* bed position," in Claim 1 of the 934 Patent. [DE 51 at 21]. Tempur argues that this word is consistent with the specification and the prosecution history. [*Id.*].

Reverie contends that the word "preset" limits the claims and, besides appearing in one embodiment, appears essentially no where in the intrinsic record when referring to the "row representing" claims. [DE 57 at 13-14]. Moreover, Reverie argues that the prosecution history cited by Tempur does not even involve the "row representing" limitation. [*Id.* at 14]. As such, Reverie maintains that the plain language is clear and adding the word "preset" is unnecessary. The Court agrees.

Relevant to this term dispute, Claim 1 (and other similar claims) of the '116 Patent provides that controlling the adjustable bed includes: "identifying a row in a data table, *the row representing a position of the adjustable bed*; within the row, identifying an increment value specifying an available position of the adjustable bed; and causing a component of the adjustable bed to meet the increment value." [DE 50-5 at 34 (emphasis added)]. As the language makes clear, the adjustable bed position relies on rows within a data table, wherein increment values specifying

28

available positions are identified. [*Id.*]. To an extent, this may be considered a manufacturer "preset" in that each row and data point are "preset" positions. However, as constructed by Tempur, adding the word "preset" to the language seems superfluous on the one hand, and on the other hand may unnecessarily limit the scope of the patent claims.

A final concern, as Reverie correctly points out, is that courts may not read embodiments into the claims, even where it is the only embodiment. *See, e.g., EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014). Thus, the Court finds that the plain language, particularly in the context of the surrounding language, is sufficient.

**4. "providing feedback to a user on the handheld remote control to indicate the success of the command" ('457 Patent, Claim 20)**

| Reverie's Proposed Construction | Tempur's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | Providing feedback from the controller to the receiver to the user on a handheld remote control to confirm the success of the control signal |

Tempur has not asked the Court to construe any of the words in the claim, but rather, proposes an addition to the claim language: "providing feedback *from the controller to the receiver* to the user on a handheld remote control to indicate the success of the *control signal*." [DE 51 at 15-16 (emphasis added on the

additional terms)]. First, Tempur argues that these changes are necessary because in order to "indicate the success of the command," the feedback must originate from the bed controller. [*Id.* at 16]. Additionally, Tempur maintains that success of the command must relate to the control signal because that signal was originally provided from the remote control to the controller. [*Id.*].

Reverie submits that this claim term is also clear on its face. Reverie argues that the specification states that the control box *may*, rather than must, interpret the remote command into a command the actuator *may* understand and *may* transmit the command to extend the head section actuator to move the head section up. [DE 57 at 12]. Reverie again maintains that the word "may" is permissive and not a mandatory function. [*Id.*]. As a result, Reverie explains that the feedback need not originate from the controller. [*Id.* at 13].

Although functionally the feedback may originate from the controller, as Reverie points out, Claim 20 of the '457 Patent is silent on the matter. Specifically, the passage in dispute states:

> A system comprising: an adjustable bed having machine-adjustable articulated portions; a controller for the adjustable bed, the controller including a wireless interface, the controller capable of two-way wireless communication with a handheld remote control, wherein the handheld remote control is communication matched to the adjustable bed controller with a code key indicating that commands can be received and executed therebetween; *and the handheld remote control capable of*: transmitting

> a control signal to the adjustable bed controller using
> the two-way wireless communication system; and *providing*
> *feedback to a user on the handheld remote control to*
> *indicate the success of the command*.

[DE 1-2 at 38, Claim 20 of the '457 Patent (emphasis added)]. Thus, Claim 20 of the '457 Patent merely contemplates that the handheld remote control be capable of providing feed back to indicate the success of the command. Ultimately, Tempur's proposed addition concerning the origin of the feedback seems to turn system Claim 20 of the '457 Patent into a method claim, when Claim 20 is silent on the matter.

Tempur's proposed replacement of the word "indicate" to "confirm" is also improper. As discussed above, the '457 Patent functions, like the '328 Patent, are not limited to success alone, which the word "confirm" may imply. Instead, the specification teaches that the feedback may indicate how successful the command was, that is: that the command has failed, is in progress, conflicts with another command, or the like, in addition to confirming its success. [DE 57 at 13; DE 50-3 at 35-36].

Accordingly, the Court finds that no construction is needed here.

## C. CLAIMS CHALLENGED FOR INDEFINITENESS

Tempur contends that the following claims terms are invalid as indefinite because the language fails to inform about the scope

of their respective patents. [DE 51 at 25-30]. The Court will consider each term in turn.

As an initial matter, Tempur has the burden of proving indefiniteness by clear and convincing evidence. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). A patent claim is indefinite only if when "read in the light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124, 189 L.Ed.2d 37 (2014).

## 1. "a controller of the component" and "the controller" ('934 Patent, Claims 2, 4)

Tempur alleges that the term "a controller of the component of the adjustable bed" in Claim 2 of the '934 Patent has no antecedent basis for the component in Claim 1. [DE 51 at 25-26]. Reverie argues that the claim read as a whole identifies what "component" is recited in Claim 2, as the only thing being controlled in Claim 1 is the actuator. [DE 57 at 21-22]. Reverie also points to the abstract which states that "a component of the adjustable bed is controlled to meet the increment value," and "the component includes at least one of an actuator and a vibration motor." [*Id.* at 22].

Although not explicitly stated, a person of ordinary skill reviewing the '934 Patent in its entirety would readily understand that the "controller of the component" is the controller of the actuator. Therefore, to the extent necessary, the "the component" referenced in Claims 2 and 4 are construed to mean the actuator.

## 2. "control command" ('934 Patent, Claim 6)

Although Tempur argues indefiniteness as grounds to invalid this claim, the arguments seem more grounded in claim differentiation. [DE 51 at 26-27]. Under 35 U.S.C. § 112, a dependent claim must add a limitation to those recited in the independent claim. While the doctrine of claim differentiation requires that the limitations in a parent claim be construed to be different in scope from those in dependent claims, it does not necessarily mean that they are mutually exclusive. *TecSec, Inc. v. Adobe Sys. Inc.*, 658 Fed. Appx. 570 (Fed. Cir. 2016). The only requirement is that the limitation in the parent be at least broad enough to encompass the limitation in the dependent claim. *Id.* (citing *Tr. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016)).

The parent claim at issue here in the '934 Patent, Claim 1, identifies "a control command from a user." [DE 50-6 at 37]. Claim 6, the dependent claim, recites a "user command." [*Id.*]. While the terms certainly relate to similar functions, they are not

necessarily equal in scope. Claim differentiation only requires "the limitation in the parent to be at least broad enough to encompass the limitation of the dependent claim." *TecSec, Inc.*, 658 Fed. Appx. at 577. While Tempur maintains the claim is invalid because Reverie has not differentiated between Claims 1 and 6, it is Tempur that carries the burden of proof. *BASF Corp.*, 875 F.3d at 1365. Here, Tempur has not demonstrated why the claim is invalid, simply because it may overlap with the parent claim.

### 3. "mechanically controlled" ('934 Patent, Claim 7)

For similar reasons as the term "command control," Tempur's challenge of "mechanically controlled" in Claim 7 of the '934 Patent also fails. [DE 51 at 27]. That is, Tempur has failed to meet its burden for invalidating a claim. *BASF Corp.*, 875 F.3d at 1365.

### 4. "the position recall command" ('328 Patent, Claim 1)

Tempur contends that the term "position recall command" in Claim 1 of the '328 Patent has no antecedent basis, and therefore is indefinite. This argument fails because, as Reverie points out, the beginning of Claim 1 describes the handheld remote control as "having a user interface adapted to initiate a transmission of *a present recall command* from the handheld remote control to the adjustable bed using the two-way wireless communication system to

34

return to a preset recall position." [DE 50-8 at 37 (emphasis added)].

## 5. "optionally one or more" ('357 Patent, Claim 1)

Tempur challenges the term "optionally one or more" from Claim 1 of the '357 Patent, contending that it renders the bounds of the invention indefinite. [DE 51 at 27-28]. In support, Tempur cites to *Hockeyline, Inc. v. Stats, LLC*, which found that the term "optionally provides," as used in the patent's Claim 9, was "superfluous, since it may or may not be part of the invention." No. 1:13-cv-1446, 2013 WL 11091886, at *6 (S.D.N.Y. Dec. 16, 2013). Tempur contends that the Federal Circuit affirmed *Hockeyline* in 2016, and should, as a consequence, be the controlling authority. [DE 51 at 27-28; DE 62 at 10].

Reverie maintains that patent examiners' acceptance of such terms is evidence that optional limitations are not indefinite *per se*. [DE 57 at 25-26]. Although Reverie does not discuss *Hockeyline*, Reverie cites other cases indicating that no such *per se* rule exists, and where similar terms have been upheld. [*Id.*]. The Court agrees.

First, Tempur's reliance on the Federal Circuit's decision in *Hockeyline* is misplaced. Shortly after the district court's decision in *Hockeyline*, the case was stayed due to an ongoing appeal before the Patent Trial and Appeal Board ("the Appeal

Board"), involving different claims of the same patent. *Hockeyline, Inc. v. Stats, LLC*, No. 1:13-cv-1446, at DE 46. Ultimately, the Appeal Board invalidated a number of claims, including Claims 1 and 8 of the patent at issue in *Hockeyline*. The Appeal Board's decision was then affirmed by the Federal Circuit. *See Hockeyline*, 670 Fed. Appx. 703 (Fed. Cir. 2016). Thus, it was the Appeal Board's decision, not the district court's that was affirmed by the Federal Circuit in 2016. Notably, the Federal Circuit's decision to invalidate Claim 9 was based on the Appeal Board's invalidation of, among others, Claims 1 and 8, which were parents to Claim 9. *Id.* at DEs 46, 53. That is, neither the Federal Circuit's, nor the Appeal Board's decisions made any determination concerning the term "optionally provides," despite Tempur's contention otherwise.

Notwithstanding, other courts have upheld similar language. *See, e.g., Mosaid Techs., Inc. v. Freescale Semiconductor, Inc.*, No. 6:11-CV-173, 2013 WL 1253516, at *3 (E.D. Tex. Apr. 29, 2013). For example, in 2015, the Federal Circuit upheld the phrase "optionally topped with inert gas," in part, because it was supported by the specification and modified the surrounding language. *See Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1372-73 (Fed. Cir. 2015). Likewise, "optionally," as used here in Claim 1 of the '357 Patent, modifies "one or more of implementing a safety feature, communicating an error,

36

communicating a software update, communicating a preference, communicating a setting, and communicating a report." [DE 50-4 at 110]. Tempur has provided no indication as to how the term or those it modifies lack clarity, nor has Tempur given a sufficient reason for invalidating Claim 1 of the '357 Patent. Consequently, Tempur fails to meet the necessary burden. *BASF Corp.*, 875 F.3d at 1365.

**6. "substantially flat" and "substantially raised" ('366 Patent, Claims 1, 25)**

Tempur argues that the terms "substantially flat and substantially raised, as used in Claims 1 and 25 of the '366 Patent are also indefinite. [DE 51 at 28-29]. Specifically, Tempur states that the terms suffer by failing to specify to what degree they are measured. [*Id.*]. Without guidance from the claims, specification, or prosecution history to demonstrate how flat or raised the positions must be to be "substantial," the claims are indefinite.

Reverie maintains that this is not necessary. The Court agrees. Courts have repeatedly held that there is no per se rule that the term "substantially" is indefinite; in fact, many have found it sufficiently definite, despite not being perfectly precise. *See, e.g., Mfg. Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, No. 17-269-RGA, 2018 WL 4627661, at *7 (D. Del. Sep. 27, 2018); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*

*Grp.*, No. 8:10CV187, 2011 WL 5976264, at *5 (D. Neb. 29, 2011); *Raytheon Co. v. Indigo Sys. Corp.*, 682 F. Supp. 2d 717, 727 (E.D. Tex. 2010). Moreover, the Federal Circuit has also upheld the use of "substantially" as a term of degree. *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1377 (Fed. Cir. 2013); *Sonix Tech. Co. v. Publ'ns Int'l Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017); *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1206 (Fed. Cir. 2017).

Thus, the Court finds that the term "substantially" is sufficiently definite for a person of ordinary skill in the art to determine its meaning.

### D. CLAIMED DESIGN OF THE D553 PATENT

As shown above, the parties dispute aspects of the D553 design patent and Tempur has offered a proposed construction in order to describe the D553 Patent in words.

"Whether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device." *Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed. Cir. 1997). "A design patent only protects the novel, ornamental features of the patented design." *Id.* at 1405. "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Id.* "[T]he preferable course

38

ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008). "Thus, the general rule that now governs design claim construction is that 'the illustration in the drawing. . . is its own best description.'" *WCM Inds., Inc. v. IPS Corp.*, No. 2:13-cv-02019-JPM-tmp, 2014 WL 8508559, at *50 (W.D. Tenn. Nov. 10, 2014) (internal citations omitted).

Nonetheless, "the scope of [a] claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010). "If the patented design is primarily functional rather than ornamental, the patent is invalid. However, when the design also contains ornamental aspects, it is entitled to a design patent whose scope is limited to those aspects alone and does not extend to any functional elements of the claimed article." *Id.* at 1293-94.

Here, Reverie has proposed the following construction, which essentially just points to the design patent figures above: "The ornamental design for an adjustable bed as shown and described in Figures 1-2." However, Tempur contends that more is required in order accurately portray the images in written form. To that end, Tempur seeks to add the following description:

39

> The ornamental design for an adjustable bed, as shown
> and described in Figures 1-2, where the head segment of
> the top body support portion is thinner than the foot
> segment of the top body support portion, where the head
> segment of the top body support portion overhangs the
> head portion of the bottom frame portion, where the sides
> of the head, torso, leg, and foot segments of the top
> body support portion do not overhang the bottom frame
> portion, where the foot segment of the top body support
> portion does not overhang the foot portion of the bottom
> frame portion, and where the bottom frame portion is a
> closed frame.

[DE 51 at 23]. Tempur believes this construction of the D553 patent reflects its ornamental features. [*Id.*].

Reverie maintains that Tempur's proposal is overly narrow and conflicts with the intrinsic evidence. In particular, Reverie takes issue with Tempur's limitation requiring that the head segment of the top body support portion to be thinner than the foot segment. [DE 57 at 29-32]. Although Figure 1 appears to show a thinner top portion, Reverie argues that Figure 1 was drawn to show perspective; Figure 2, on the other hand, offers a direct comparison of the thickness of the bed segments, demonstrating that they have "substantially the same thickness." [*Id.* at 30].

In light of the prosecution history and case law, the Court agrees with Reverie that no construction is needed for the D553 Patent. First, upon application, the patent examiner stated that "the claimed design has a body support portion or surface with four segments that are quite thin and each segment has substantially the same thickness." [DE 51-9 at 6]. This was in

comparison to a similar design patent, U.S. Patent No. 6,276,011 (referred to as "*Antinori*"), which the examiner noted differences in segment thickness. [*Id.* at 7].

When referring to the lengths of the D553 segment portions, the examiner noted that "the upper and lower portions have nearly identical lengths, giving an appearance of a unified whole." [*Id.* at 8]. To Tempur's point, the examiner did not describe the D553 Patent as having any substantial overhang, particularly as compared to *Antinori*, which the examiner found to "overhang[] dramatically." [*Id.*]. The examiner went on to note that the D553 Patent and *Antinori* had several differences, including "different overhangs." [*Id.*]. To be sure, while the D553 Patent does not have "dramatic" overhang, the patentee did acknowledge that the "top portion overhangs slightly at the head of the bed, but does not overhang at the foo[t] of the bed, giving the bed a generally unified appearance." [DE 51-8 at 4].

Nevertheless, although claim construction can be used to guide the fact finder through issues, verbal claim constructions of design patents may increase "the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole." *Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (citing *Egyptian Goddess, Inc.*, 543 F.3d at 680)). Accordingly,

41

the Court finds that no construction is needed as the D553 Patent is best represented by its own photographic illustration. *See, e.g., WCM Inds.,* 2014 WL 8508559, at *50. Notwithstanding, to the extent necessary, the segments will be construed as being substantially the same thickness, with a top portion that overhangs slightly at the head of the bed.

## IV. CONCLUSION

Accordingly, for the reasons articulated above, the terms **SHALL** be construed as follows:

| CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|
| "two-way wireless communication" and "two-way wireless communication system" ['457 Patent, Claim 20]<br><br>"two-way wireless communication system" ['328 Patent, Claims 1, 13] | A system for wirelessly communicating back and forth, either directly or indirectly |
| "code key" ['457 Patent, Claim 20] | Unique identifier |
| "unique communication link" ['934, Claim 1] | Plain Meaning |
| "the adjustable bed controller further adapted to initiate a communication from the adjustable bed controller to the handheld remote control to indicate that the adjustable bed controller has responded | Plain Meaning; where "adapted to" is construed as a mandatory function |

| | |
|---|---|
| to the position recall command" ['328 Patent, Claims 1, 13] | |
| "wood" ['366 Patent, Claims 1, 10, 13, 14, 25] | Natural wood, and engineered or composite wood |
| "increment value" ['116 Patent, Claims 1, 21, 33, 40; '934 Patent, Claim 1] | Increment angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator |
| "value representative of an acceptable value" ['457 Patent, Claim 23] | Value representative of an acceptable angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator |
| "an actuator position" ['328 Patent, Claims 1, 13] | An angle of rotation, not measured by clock or counter increments, and directly realizable by the actuator |
| "second system" ['116 Patent, Claims 1, 21, 33, 40] | Plain Meaning |
| "the row representing" ['116 Patent, Claims 1, 21, 33, 40; '934 Patent, Claim 1] | Plain Meaning |
| "providing feedback to a user on the handheld remote control to indicate the success of the command" ['457 Patent, Claim 20] | Plain Meaning |

43

| | |
|---|---|
| "a controller of the component"<br>['934 Patent, Claim 2]<br><br>"the controller"<br>['934 Patent, Claim 4] | Not indefinite or invalid; to the extent necessary, the "the component" referenced in Claims 2 and 4 are construed to mean the actuator. |
| "control command"<br>['934 Patent, Claim 6] | Not indefinite or invalid |
| "mechanically controlled"<br>['934 Patent, Claim 7] | Not indefinite or invalid |
| "the position recall command"<br>['328 Patent, Claim 1] | Not indefinite or invalid |
| "optionally one or more"<br>['357 Patent, Claim 1] | Not indefinite or invalid |
| "substantially" flat, raised<br>['366 Patent, Claims 1, 25] | Not indefinite or invalid |
| D553 Design Patent | No construction; to the extent necessary, segments are construed as "substantially the same," with a top portion that overhangs slightly at the head of the bed. |

**IT IS SO ORDERED.**

This the 28th day of July, 2021.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge