UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| ASCION, LLC, d/b/a REVERIE,<br><br>    Plaintiff,<br><br>v.<br><br>TEMPUR SEALY INTERNATIONAL, INC., f/k/a TEMPUR-PEDIC, *et al.*,<br><br>    Defendants. | CASE NO. 5:17-CV-403-KKC<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on motions to exclude (DEs 317/318, 324/325) filed by Plaintiff Ascion, LLC ("Reverie") and Defendants Tempur Sealy International, Inc. and Tempur-Pedic Management, LLC (collectively, "Tempur"). Each party seeks to exclude the other's expert on damages. Now that the motions are fully briefed, they are ripe for review.

**I.    Background**

Reverie alleges that Tempur infringed upon seven of its patents. These patents include: U.S. Patent Nos. 8,682,457 ("the 457 Patent"); 8,909,357 ("the 357 Patent"); 8,046,116 ("the 116 Patent"); 8,565,934 ("the 934 Patent"); 9,044,366 ("the 366 Patent"); 8,869,328 ("the 328 Patent"); and U.S. Design Patent No. D720,553 ("the D553 Patent"). Reverie alleges the infringement of 31 claims across these seven patents, which relate to adjustable bed frames, mattresses, and accessories. This action was originally filed in the United States District Court for the Eastern District of Michigan before being transferred to this Court on October 16, 2017.

The Court has already conducted a *Markman* hearing in this matter and issued its claim construction order. (DE 136.) Now, both parties have filed motions for summary judgment and various motions to exclude expert testimony. The only motions to exclude that

remain are aimed at each party's expert on damages. Accordingly, the Court will analyze each motion in turn.

## II. Analysis

Under Federal Rule of Evidence 702, expert testimony will be admitted where the proponent satisfies four requirements: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702(a)-(d). "The party proffering the expert has the burden of proving by a preponderance of the evidence that the expert satisfies Rule 702." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

As to reliability, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony." Fed. R. Evid. 702, advisory committee notes to 2000 amendment. Rule 702 provides "general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702).

A court's inquiry must focus "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30. Courts

2

should confirm that "the factual underpinnings of the expert's opinion [are] sound," *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999), but generally "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation omitted). "Mere weaknesses in the factual basis of an expert witness's opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quotations and citation omitted); *United States v. Davis,* 103 F.3d 660, 674 (8th Cir. 1996) (noting defendant was "free to challenge the expert's conclusions and point out the weaknesses of the [expert's] analysis to the jury during cross-examination" but "[w]eight and credibility are the province of the jury.")

### A.     Tempur's Motion to Exclude the Expert Testimony of Philip Green

Tempur moves to exclude the testimony of Philip Green ("Green"), which relates to the damages of the alleged infringement. Tempur argues for exclusion for the following reasons: (1) Green failed to value the Remote Control Patents (the 116, 934, 457, 328, and 357 Patents) separately; (2) Green failed to limit damages only to the value of the infringing features of the Remote Control Patents; and (3) Green provides *ipse dixit* opinions for his reasonable royalty analysis of the Bed Frame Patent.

#### 1.     Valuing the Remote Control Patents Separately

Tempur argues that Green's reasonable royalty opinions should be excluded because he concluded that Tempur "would pay a single royalty rate for all of the five Remote Control Patents." (DE 318-1 at 10.) Tempur claims that Green erred in assuming that the reasonable

3

royalty rate would not change if the number of Remote Control Patents changed and that the parties would consider the Remote Control Patents together in a hypothetical negotiation. (*Id.*)

Tempur takes issue with several aspects of Green's opinion relating to the grouping of patents for the purpose of valuing damages. It first notes that the five Remote Control Patents, while similar, are not identical. (*Id.*) Therefore, it argues that the royalty rate would decrease if one of the Remote Control Patents were dropped from the case because the royalty rate must cover only the footprint of the invention and no more. It argues that Green erred in claiming that the royalty rate would stay the same if a subset or one of the patents are found infringed, as well in assuming that the Remote Control Patents cover identical technologies. It further asserts that Green's opinion that rights to all of the Remote Control Patents would be considered at a hypothetical negotiation under *Georgia-Pacific* is unreliable because it is conclusory and unsupported by the record.

In response, Reverie maintains that Green correctly applied the *Georgia-Pacific* framework, see *infra* Section II.B.2, and found that a single royalty rate was applicable to the facts. Reverie further points out that Tempur's own damages expert grouped multiple patents together with a single royalty rate. It argues that Green's opinions are reasonable given the patents' "similarities in disclosures, structures, language, and functionality[.]" (DE 341 at 8.) Reverie also argues that Green's opinions are reasonable as he also claims that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.* at 10.) According to Reverie, not only did Green rely on other experts in reaching these conclusions, but he also relied on statements from the inventor of the Remote Control Patents, Martin Rawls-Meehan.

Here, the record demonstrates that it was reliable for Green to group the Remote Control Patents under the same reasonable royalty rate, as well as claim that they would

4

have been considered at the same time during negotiation. Similar to Tempur's damages expert, Green analyzed the five Remote Control Patents under the *Georgia-Pacific* framework and accordingly determined that it was appropriate to assign them a single royalty rate. He found that four of the five patents (the 116, 934, 457, and 328 Patents) arose from the same patent family, and the fifth patent (the 357 Patent) was "directed to similar technology[.]" (DE 341 at 6-8.) Further, the parties have previously grouped those four patents together as a family and acknowledged a similarity with the fifth patent. Accordingly, the Court will decline to exclude Green's expert testimony on these grounds because Green has demonstrated a reliable basis for grouping the Remote Control Patents together.

### 2. Limiting Damages Only to Infringing Features

Tempur also argues that, regardless of the facts and data Green relied on, his methodology is unreliable because he failed to account only for the value of the infringing features to the accused products. It claims that additional apportionment was required because experts must apportion beyond the smallest saleable units if they contain non-infringing features—and it claims that it is undisputed that the control box and Wi-Fi module, which Green identifies as two smallest saleable units, contain non-infringing features. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018) ([I]f the smallest saleable unit—or smallest identifiable technical component—contains non-infringing features, additional apportionment is still required."); *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("Whether 'viewed as valuable, important, or even essential,' the patented feature must be separated.").

Reverie argues that Green properly recognized that it was necessary to apportion between the patented and unpatented features of the Remote Control Patents and asserts that Tempur "essentially ignores" Green's apportionment analysis related to the patents. (DE 341 at 17-18.) Reverie claims that Green's "cost-based apportionment," which compares the

5

relative costs of the infringing activity or component to the overall cost, was a proper and reliable method of calculating a reasonable royalty rate. In making this analysis, Green examined Tempur employee emails, other marketing and internal documents, and deposition testimony of Tempur's witnesses. (DE 341 at 20.)

The Court is not persuaded that Green properly apportioned between the infringing and non-infringing features of the accused products. Indeed, the cost-based apportionment strategy that Green employed is appropriate only if its conclusions "reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc.*, 767 F.3d at 1326). "Logically, an economist could do this in various ways—by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Id.* "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* It appears that Green did not meet this requirement.

Green employed three different approaches to his apportionment analysis. In the first approach, Green apportioned to the control box; in the second approach, he apportioned to the handheld wireless remote, control box, and Wi-Fi module; and in the third approach, he apportioned to only the handheld wireless remote. Yet Tempur notes that the handheld wireless remote itself "is not accused of infringing three of the five Remote Control Patents." (DE 362 at 2.) Regardless of whether "examining the costs and profits of remote controls and controllers, among other components, was a good proxy for estimating the contribution of the patents to the overall products[,]" Green was required to apportion "to the infringing features of the product, and no more." (DE 341 at 19-20); *Ericsson, Inc.*, 773 F.3d at 1226. While the record suggests that Green, in all three approaches, began his analysis with the smallest

6

saleable units, it does not show that he apportioned to only their infringing features as the Federal Circuit mandates.

The Court is persuaded that, in making reasonable royalty analyses, experts must apportion beyond smallest saleable units if they contain non-infringing features. *See Finjan, Inc.*, 879 F.3d at 1311; *VirnetX, Inc.*, 767 F.3d at 1329. The record does not show how, nor does Reverie explain how, Green apportioned beyond the relevant smallest saleable units in the instant matter. Reverie appears to concede that the smallest saleable units in question did, in fact, contain non-infringing features and functionality that Tempur added to the product. (DE 341 at 22.) While Green very well may have conducted his analyses based on sufficient facts and data, the failure to apportion beyond smallest saleable units containing non-infringing features renders a methodology unreliable. Accordingly, the Court will exclude Green's expert opinions on the reasonable royalty of the Remote Control Patents.

### 3. Reasonable Royalty of the Bed Frame Patent

Tempur argues that Green's reasonable royalty analysis of the Bed Frame Patent should be excluded as unreliable because he did not appropriately explain how he reached his reasonable royalty conclusion. Specifically, Tempur claims that Green does not explain "*why* or *to what extent* each particular *Georgia-Pacific* factor and each of the qualitative data points impacted his reasonable royalty calculation." (DE 318-1 at 28.) It claims that Green fails to explain how the *Georgia-Pacific* factors would affect the hypothetical negotiation, as well as how he actually arrived at his royalty rate. (*Id.* at 28-29.)

The Court finds that Green's reasonable royalty analysis of the Bed Frame Patent is sufficiently detailed to render his opinions reliable. He extensively explains the various Tempur documents that he examined in conducting his analysis, including documents relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (DE 315-10 at ¶¶ 129-30.) He also evaluated the

7

Bed Frame Patent's reasonable royalty by looking to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at ¶¶ 144-54.) Green does not simply mention ▮▮▮▮▮▮▮▮ and then pick an unexplained reasonable royalty. His expert report incorporates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in reaching his conclusion. The Court cannot divorce that statement from the rest of his extensive analysis on the Bed Frame Patent as justification to exclude his expert testimony on its reasonable royalty rate.

Accordingly, the motion to exclude Green's expert testimony will be granted in part, in that only his opinions and testimony on the reasonable royalty analysis of the Remote Control Patents are excluded.

### B. Reverie's Motion to Exclude the Expert Testimony of Brian Napper

Reverie moves to exclude the testimony of Brian Napper ("Napper"), which relates to the damages of the alleged infringement. (DE 326-1 at 1.) Specifically, Reverie takes issue with: (1) Napper's profit analysis of the design patent; (2) Napper's reasonable royalty analysis; and (3) Napper's breach of confidentiality damages analysis.

#### 1. Profit Analysis of the Design Patent

Reverie argues that Napper improperly calculated Tempur's supposed profits from sales of the accused product, the Ergo Plus, by relying on the following: (1) the alleged ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that were not produced during fact discovery; (2) the improper allocation of expenses not directly attributable to the sale of the Ergo Plus; and (3) other improper deductions, such as taxes. The Court will analyze each argument in turn.

**First,** Reverie takes issue with Napper's reliance on ▇▇▇▇▇▇, which it claims were not produced during fact discovery. (DE 324 at 10.) These payments were summarized in Exhibit 1 to Napper's report, but Reverie asserts that Tempur never produced that summary nor the underlying invoices during fact discovery. It argues that this failure goes against documents requests that it served on Tempur for "accounting records, invoices, and other financial documents that would show Tempur's costs and calculation of profits, as well as any other documents and information upon which Tempur would rely for its damages analysis." (*Id.* at 11.)

In response, Tempur states that "it will not offer Mr. Napper's opinions or testimony based on ▇▇▇▇▇▇▇▇▇▇ "to avoid dispute[.]" (DE 345 at 14.) Reverie indicates that this concession is proof that Napper's entire profit analysis is unreliable. But the Court finds that the across-the-board exclusion of his profit analysis would be an extreme remedy when a narrower, more appropriate remedy is available. Accordingly, the Court will instead exclude Napper's opinions and testimony based on ▇▇▇▇▇▇▇

**Second,** Reverie claims that Napper improperly deducted costs that are not directly attributable to the manufacture or sale of the Ergo Plus. (DE 324 at 12.) It argues that Napper fails to prove "a nexus between the cost sought to be deducted and the sale of the accused product." (*Id.*) Reverie specifically takes issue with Napper's pro rata approach to the allocation of expenses, claiming that such an approach is improper in a patent case because it fails to demonstrate a nexus between costs and sales. (*Id.* at 13.)

Tempur, however, argues that Napper's pro rata approach was appropriate because simply taking issue with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is not sufficient grounds to exclude his expert opinion. (DE 345 at 11.) They cite to a Middle District of Florida case, *Delta T, LLC v. Dan's Fan City, Inc.*, No. 8:19-cv-1731-VMC-SPF, 2021 WL

9

2159889, at *2-3 (M.D. Fla. May 27, 2021), in support of their argument. In *Delta T, LLC*, the court explains that "[n]either case law nor logic provides a clear rule for the proper treatment of fixed expenses in computing an award for profits." *Id.* at *6 (citation omitted). Thus, it found that "Delta T has provided no authority requiring that Defendants' calculation of fixed costs be excluded because it is based on an "across-the-board" calculation" and did not find the calculation "prejudicial, confusing, or misleading at this juncture." *Id.* at *6-7.

While neither party has presented binding case law that governs this issue, the Court is persuaded by the various cases cited by Reverie that support its argument that Napper's pure allocation methodology is insufficient. The record shows that Napper divided Ergo Plus sales by the overall sales of all Tempur products and then applied that percentage to costs and expenses. Various courts have rejected this methodology for determining costs and expenses of an accused product. *Folken v. Wyland*, No. C-01-1241 DEL, 2002 WL 1677708, at *15 (N.D. Cal. July 22, 2002) ("While this pure allocation process of overhead costs is appealing, it has been specifically rejected in the Ninth Circuit in the absence of a showing that the costs are attributable to the infringing product."); *see also Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984) (holding beyond allocation, deduction for overhead should be allowed "only when the infringer can demonstrate that [the overhead expense] was of actual assistance in the production, distribution[,] or sale of the infringing product."). "An infringer need not prove overhead expenses and their relationship to the infringing production in minute detail, but must explain at least in general terms how claimed overhead actually contributed to the production of the infringing work." *Folken*, 2002 WL 1677708, at *15.

Tempur has offered no concrete evidence that shows how Napper's profitability analysis tied costs and expenses specifically to the Ergo Plus. When faced with the "nexus" inquiry during his deposition, Napper explained that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

10

███████████████████████████████████████████████████████████████████

████████████████████████████████ (DE 324-4 at 104:12-21.) As a result, he claimed ████

███████████████████████████████████████████████████████████████████

█████████████████████████████████ (*Id.*) But such a generality cannot serve as proper connecting tissue between the alleged costs and the Ergo Plus.

It appears obvious that sales and marketing expenses are required to sell products in a competitive market. Yet Napper did not account for differences between the Ergo Plus and other products, and how those differences could lead to differences in production and cost. He did not conduct a regression analysis to determine costs directly related to the Ergo Plus. Instead, he appears to claim that ████████████████████████████████████████ was enough to connect costs and expenses to the Ergo Plus. (*Id.* at 96:1-17.) Because he claimed that ██████████████████████████████████████████ he believed an across-the-board allocation methodology was appropriate. (*Id.* at 96:20-24-97:1-7.) The Court finds that these beliefs about general costs and expenses do not adequately establish a nexus between the cost sought to be deducted and the sale of the accused product. Accordingly, the Court will exclude Napper's expert opinions on the design patent damages and decline to address Reverie's argument regarding alleged improper deductions of other expenses.

### 2. Reasonable Royalty Analysis

Reverie argues that Napper's reasonable royalty opinion relies on an improper comparison to Wi-Fi licenses. While it concedes that Napper relied on the appropriate *Georgia-Pacific* factors for a reasonable royalty analysis, it argues that Napper relied on "standard essential licenses for Wi-Fi technology" that Tempur failed to produce during discovery. (DE 324 at 16.) It also asserts that "it's not even clear that Napper . . . reviewed those licenses" and that Reverie's patents are directed to adjustable beds, "not to Wi-Fi *per*

*se*." (*Id.*) Because of the alleged production failure and improper comparison, Reverie claims that Napper's reasonable royalty opinion should be excluded.

Tempur argues that Reverie's argument is based on "misstatements regarding Mr. Napper's opinion." (DE 345 at 15.) Contrary to Reverie's assertion, Tempur claims that Napper *does not* opine that the Wi-Fi licenses are comparable licenses. Instead, it argues that Napper relied on the Wi-Fi licenses under *Georgia-Pacific* Factor 13, not Factor 2. Factor 2 requires the consideration of "royalty rates and other terms in comparable licenses." DE 324 at 16.) Napper, however, found that Factor 2 was not applicable in the instant matter. (DE 345 at 15.) Yet under Factor 13, Napper explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He claims that this test permitted him to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Notably, Reverie does not refute this claim in its reply.

Tempur also argues that Napper reviewed "publicly adjudicated royalty rates" for "Wi-Fi Standard Essential Patents" when considering the Wi-Fi licenses. (DE 345 at 16.) Further, it notes that Napper considered the contribution of Wi-Fi technology within the context of the claimed patents. (*Id.*) Ultimately, the Court is persuaded that Reverie's arguments tend to challenge the "degree of comparability" of the licenses rather than whether they are comparable at all. Case law is clear that this argument is an issue of weight. *See Ericsson Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014) ("Here, whether these licenses are sufficiently comparable such that Motorola's calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility."). The Court will therefore decline to exclude Napper's opinions on these grounds.

### 3. Breach of Confidentiality Damages

Reverie argues that Napper's opinions on damages stemming from a breach of the confidentiality agreement should be excluded because they are based entirely on speculation. (DE 324-1 at 17.) Reverie's damages expert, Green, opined that breaching the confidentiality agreement gave Tempur "a two-year head start" in selling products based on confidential information and based his damages calculations on that two-year period. Napper, in rebuttal, opined that customers would have waited two years before buying products that Reverie alleges were based on the improperly-used confidential information. Reverie asserts that such an opinion amounts to speculation because it was not based on any documentation, surveys, or tangible evidence.

In response, Tempur argues that this argument is best suited for cross-examination and that Reverie mischaracterizes Napper's opinions and deposition testimony. It asserts that Napper is merely criticizing Green's "head start" theory of damages and that Reverie narrows Napper's opinion about what customers might have done if Tempur's beds had not been sold yet. Not only does Napper opine that customers might have waited to purchase the accused products until after June 2015, he also opines that customers might have purchased a different Tempur bed that was available, or they might have purchased a Tempur mattress and eventually buy an adjustable bed base in June 2015. These opinions are not the kind of speculation that should be excluded. If anything, Napper is simply addressing the various paths that a customer interested in a Tempur adjustable bed might have taken had the accused products not been released.

Further, Tempur asserts that Napper made these reasonable assumptions based partially on "documents showing (1) Reverie's significant sales and marketing expenditures and operations, and (2) Tempur documents that describe that the head-up products of Tempur were going to reduce or cannibalize existing product sales." (DE 345 at 19.) The Court finds that Napper's expert testimony on the breach of confidentiality damages is supported

13

by sufficient facts and data. Any weaknesses in the factual basis of Napper's opinions are best challenged during cross-examination, not in a motion to exclude.

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) Tempur's motion to exclude the expert testimony on damages of Philip Green (DE 317/318) is GRANTED IN PART, in that Green's opinions and testimony on the reasonable royalty analysis of the Remote Control Patents are EXCLUDED;

2) Reverie's motion to exclude the expert testimony on damages of Brian Napper (DE 324/325) is GRANTED IN PART, in that Napper's opinions and testimony based on ▮▮▮▮▮▮▮▮▮▮ are EXCLUDED; and

3) the Clerk of the Court is DIRECTED TO FILE a redacted copy of this opinion in the record and an unredacted copy under seal.

This 31st day of March, 2025.

*Karen K. Caldwell*
KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY